IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| GALEN LEE JIMMERSON, | | |
| Plaintiff, | | 4:09-cv-00301-JAJ |
| vs. | | |
| MICHAEL J. ASTRUE, | | |
| Commissioner of Social Security, | | **ORDER** |
| Defendant. | | |

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits and Supplemental Security Income benefits. This court finds that the decision of the Social Security Administration is not supported by substantial evidence. The final decision of the Commissioner of Social Security is reversed and remanded for an award of benefits.

## I.  PROCEDURAL BACKGROUND

Plaintiff Galen Lee Jimmerson ("Jimmerson") initially applied for disability insurance benefits on August 27, 2003, alleging an inability to work from January 20, 2003 (Tr. 68).  He alleges disability on the basis of carbon monoxide poisoning and concomitant chest pain, memory loss, and vision and breathing problems; he also alleges neck and back problems (Tr. 98-99).  The main thing that keeps him from working, he claims, is his lungs (Tr. 549).  The Social Security Administration ("SSA") denied Jimmerson's application on April 5, 2004 (Tr. 36-39).  The SSA denied his application again on reconsideration on August 23, 2004 (Tr. 32-34).  On September 8, 2004, Jimmerson filed a request for a hearing on his claim (Tr. 57-59, 64).  Administrative Law Judge George Gaffaney ("the ALJ") held a hearing on Jimmerson's claim and issued an opinion denying the claim on May 18, 2007 (Tr. 16-27).  On July 13, 2007, Jimmerson requested review by the Appeals Council (Tr. 13-14).  The Appeals Council denied Jimmerson's request for review on May 29, 2009 (Tr. 7-9).  Jimmerson filed this action

for judicial review on July 29, 2009 [Dkt. 1].  The case was ready for decision on April 23, 2010 [Dkt. 15].

## II.  FACTUAL BACKGROUND

Jimmerson was thirty-four years old at the time of his alleged disability onset date (Tr. 68).  He is a high school graduate (Tr. 103), and had steady work as a hired hand in farming operations from as early as 1990 until 2000 (Tr. 101-102).  He worked as a production manager in hog confinement from 2000 to January 20, 2003, his alleged onset date (Tr. 101).  During that time he also worked his own land (Tr. 111), and helped work his father's land (Tr. 549-50).  Previous to his alleged onset date, Jimmerson rode bulls in rodeos, broke wild horses, went to dances, and played basketball (Tr. 111).  He doesn't do any of that anymore (Tr. 111, 114-15, 289, 312).

### A.  Relevant Medical History

1. Asthma

Jimmerson has had asthma since junior high school, but prior to his exposure to carbon monoxide, he did not use and did not require inhalers or breathing medications (Tr. 193, 226).  He reported the last exacerbation of his asthma, before his exposure to carbon monoxide, as occurring in 1995 (Tr. 193).

2. Carbon monoxide exposure and aftermath

On January 20, 2003, Jimmerson was treated for carbon monoxide poisoning at Decatur County Hospital (Tr. 166).  Jimmerson reported that at about 1:30 pm, while he was working in a small office in a garage, a co-worker was operating a power washer (Tr. 166).  Apparently, the appropriate chimney flue was not opened, causing carbon monoxide fumes to build up in the office (Tr. 183).  Jimmerson was exposed to carbon monoxide fumes for fifteen to fifty minutes (Tr. 166, 377, 545).  He experienced nausea, lightheadedness (Tr. 177), disorientation, and chest pain; he reported that he stood up and staggered, and that he barely made it to fresh air (Tr. 166).  The nurse at Decatur County

2

Hospital noted that he was "coughing up white sputum" and his chest hurt, but that he did not lose consciousness (Tr. 166). The note included that his hands were tingling and his color was "cherry pink" (Tr. 166). The carbon monoxide level in his blood was found to be elevated (Tr. 172).[1] After being stabilized at Decatur County Hospital, Jimmerson was airlifted to Iowa Methodist Medical Center in Des Moines (Tr. 166, 175). There, he was administered hyperbaric oxygen therapy, for "carbon monoxide poisoning with a dangerously high level and neurologic symptoms" (Tr. 175). Jimmerson was discharged home that evening, but returned to Decatur County Hospital the following day with continued symptoms (Tr. 168). The level of carbon monoxide in his blood was still elevated, at 5.1% (Tr. 167). He was returned to Iowa Methodist Medical Center for more hyperbaric oxygen (Tr. 168). He was admitted to the hospital for continued oxygen treatment over the next two days (Tr. 180, 183, 192). The next day, January 22, 2003, the level of carbon monoxide in his blood was back to normal, at .6% (Tr. 378). It was recommended that he remain off work for one week following discharge from Iowa Methodist (Tr. 192).

About a week after the exposure, on January 28, 2003, Jimmerson was evaluated by his family physician, Dr. Larry Richard ("Dr. Richard") (Tr. 320). Dr. Richard noted headache, weakness, dizziness, photophobia, and balance problems, and gave him Nexium (Tr. 320). On February 27, 2003, Dr. Richard noted Jimmerson's reports of "easy fatigability with just a few scoops of snow or a few scoops of feed", and that any activity made him cough and wheeze (Tr. 319). Jimmerson returned to Dr. Richard several times during 2003 and 2004 (Tr. 315-319).

A few weeks after the exposure, Jimmerson was evaluated by Dr. Babikian, a

---

[1] There is some confusion in the record regarding the actual level of carbon monoxide in his blood on the day of the exposure. It seems most likely that it was measured at 25% at Decatur County Hospital, yielding a likely initial level at the time of exposure of 35-40%. See Tr. 172, 377-78, 480-81.

neurologist, for headaches, vision loss, and loss of balance following carbon monoxide exposure (Tr. 188).   Jimmerson also reported short-term memory problems, speech slurring, breathing problems, and weakness (Tr. 188).   Dr. Babikian said he did not feel Jimmerson had a "primary neurological problem" (Tr. 190), but did recommend a brain MRI and a formal physical therapy evaluation of his balance and coordination (Tr. 189-190).   The brain MRI was normal (Tr. 191), though the radiologist noted that occasionally carbon monoxide metabolic changes of the brain are not identifiable from an image taken after exposure (Tr. 268).   The physical therapist who conducted the balancing test indicated that "the patient does have a slight loss of balance" when performing a particular test, but "no other significant findings were noted" (Tr. 182), and follow up treatment was not scheduled (Tr. 184).

After the exposure, Jimmerson was seen four times in 2003 by Dr. Michael Versackas for reports of blurred vision (Tr. 187).   Dr. Versackas saw no specific evidence of permanent eye damage or treatable pathology on each of four visits (Tr. 187, 269-271). At some point following his initial week off work after the poisoning, it was recommended by an ophthalmologist that Jimmerson remain off work for three more weeks (Tr. 193).

A little over a month after the exposure, on March 25, 2003, Jimmerson was seen by Dr. Patrick Hartley ("Dr. Hartley") in the Pulmonary Occupational Medicine Clinic at the University of Iowa, for dyspnea (difficult or labored breathing) and chest tightness (Tr. 192).   Jimmerson reported discomfort in his chest, and a "significant increase in wheeze with frequent waking at night 'out of air'" (Tr. 193).   He reported that the cough and sputum production, which were present at the time of his carbon monoxide exposure, had resolved within twenty-four hours (Tr. 193).   He reported that he had tried inhalers, which provided some relief (Tr. 193).   He reported difficulty breathing and chest discomfort with exertion, which lasted a couple of minutes but was relieved by rest or the use of Combivent (Tr. 193).

Dr. Hartley stated that Jimmerson's pulmonary symptoms were related to his asthma, saying he had "significant airflow obstruction with reversibility", and prescribed him asthma medication (Tr. 194).  Dr. Hartley was not sure whether the asthma-related symptoms were attributable to his workplace exposure, but did think it possible (Tr. 195). Dr. Hartley recommended that Jimmerson stay off work for another week or two to get his asthma under control (Tr. 195).  Jimmerson saw Dr. Hartley again on May 7, 2003, and again noted that Jimmerson's asthma was "under suboptimal control" (Tr. 222). Jimmerson reported that he got only one hour of relief from his inhaler before his difficulty breathing returned (Tr. 222).  He reported difficulty breathing with exertion walking approximately thirty feet (Tr. 222).  Dr. Hartley recommended further medication for asthma (Tr. 223).  Dr. Hartley indicated that Jimmerson could return to work on May 12, 2003, "provided he can work in an environment free of dusts, fumes, vapors, mists, aerosols, smoke (such as may be found in a clean office environment)" (Tr. 223).

On July 25, 2003, Jimmerson saw Dr. Gerard Matysik at Chest, Infectious Disease and Critical Care Associates (Tr. 225-30).  Jimmerson reported shortness of breath with ordinary activities, which he had previously been able to perform without difficulty (Tr. 225-26).  He also reported sensitivity to odors and fumes, which induced coughing (Tr. 226).  He also stated he was newly intolerant of hot and humid weather, unable to work outside (Tr. 226).  He said his lungs hurt, and that he had muscle cramps and muscle weakness which kept him from doing any manual labor (Tr. 226).  He reported gaining weight due to his recent inactivity and inability to work (Tr. 226).  He reported that he had been doing some work on his farm, but that he was limited to driving farm equipment in an air-conditioned cab (Tr. 226).  Dr. Matysik administered a spirometry[2] pre and post bronchodilator, and the latter demonstrated normal breathing mechanics (Tr. 227); Dr. Matysik listed his impression as "normal spirometry" (Tr. 229).

---

[2] A spirometer is an instrument for determining the capacity of the lungs.

Jimmerson saw Dr. Hartley again on December 17, 2003 (Tr. 275-77).  Jimmerson reported less chest discomfort in the mornings, but difficulty breathing in cold weather and with strenuous physical work (Tr. 275).  He reported episodes of gagging (Tr. 275).  Dr. Hartley advised Jimmerson to stay with his current prescriptions and added another inhaler (Tr. 276).  Jimmerson reported that he had not returned to his hog confinement managerial position, as the environment of the worksite was incompatible with Dr. Hartley's restrictions (Tr. 276).  Jimmerson indicated he had not resumed work at all due to an intervening neck condition (Tr. 275), discussed below.  Jimmerson reported he had been coaching girls basketball at a junior high school, and had been farming his own 160 acres plus another 90 acres, but reported increased symptoms when grinding feed (Tr. 275).

Jimmerson noted in a psychiatric evaluation in March 2004 that his medications – Combivent inhaler, Advair, and Singulair – improved his lung capacity but not to one hundred percent (Tr. 313).

Jimmerson reported daily headaches in June 2004, and the doctor prescribed Propranolol to treat the hypertension and headaches (Tr. 316).  He reported baling hay on a daily basis during this period (Tr. 451).  In August 2004 he reported a severe headache, blurry vision, and balance problems (Tr. 451).  He also reported chronic loss of vision in his left eye after the exposure (Tr. 451).  He was given Darvocet (Tr. 452).  He saw Dr. Chris Den Ouden, an opthalmologist, on August 20, 2004 for decreased vision in his left eye and pain around and behind his left eye (Tr. 503).  Dr. Den Ouden stated his "impression, on physical exam, is that he has a fairly much normal exam at this time", and that other tests were unnecessary (Tr. 504).

Jimmerson saw Dr. Hartley again twice in September 2004 (Tr. 505-07).  Dr. Hartley noted that Jimmerson "continues to report significant dyspnea, fatigue, though his pulmonary function tests reveal mild impairment only" (Tr. 505).  Dr. Hartley noted that Jimmerson's lung volumes were at or slightly below the lower limit of normal (Tr. 505).

He also stated that Jimmerson appeared depressed and was obviously under considerable stress (Tr. 505). He recommended a chest CT scan (Tr. 505). The scan showed no evidence of diffuse parenchymal lung disease or small airway disease (Tr. 507).

In March 2005, Jimmerson reported chronic choking (Tr. 514). In May 2005, Jimmerson continued to report shortness of breath (Tr. 509). In July 2005, Dr. Richard prescribed Luminal 2 mg at bedtime in response to the neuropsychologist's report regarding Jimmerson's carbon monoxide poisoning (discussed below); the neuropsychologist believed sleep deprivation was aggravating what Dr. Richard described as Jimmerson's diffuse, generalized, and unusual symptoms, that the expert found typical of post-carbon monoxide poisoning (Tr. 514). In April of 2006, Dr. Richard noted, in connection with treatment for a tick bite, that Jimmerson had gone turkey hunting (Tr. 513).

3. Neck and back pain

On March 13, 2003, Jimmerson complained of low back pain to his primary care physician, Dr. Richard (Tr. 248). On April 12, 2003, Jimmerson went to the emergency room complaining of increasing back pain that woke him from sleep, and difficulty with urination (Tr. 217-18). The doctor prescribed pain medication (Tr. 218).

On August 11, 2003, Jimmerson went to the emergency room complaining of very severe neck pain; the nurse practitioner noted that he appeared to be almost in tears (Tr. 238). He was kept for twenty-four hours so the doctor could control his pain and observe his respiratory status (Tr. 238). He was discharged home on August 13, 2003 with orders from Dr. Richard to do physical therapy (Tr. 240). The doctor ordered a CT scan of his neck (Tr. 238), which showed a herniated cervical disc (Tr. 231, 239). Jimmerson was subsequently treated by orthopaedic surgeons on September 12, 2003, who diagnosed him with cervical radiculopathy (Tr. 255). Jimmerson reported that the medications did reduce his pain (Tr. 266). Jimmerson received a cervical epidural injection (Tr. 255-56), which

gave him little relief (Tr. 263). Jimmerson continued treatment with the orthopaedic surgeons, returning several times, reporting continued neck pain on a daily basis (Tr. 263-65). Jimmerson indicated neck pain while on his tractor, at night, and when hooking up trailers and turning his head (Tr. 264-65). One of the orthopaedic surgeons recommended surgery, a C5-6 anterior cervical discectomy and fusion with autograft and plating (Tr. 265). The surgery was performed in January 2004 (Tr. 311, 317, 326).

Jimmerson reported hypertension (elevated blood pressure) and back pain again in June 2004 (Tr. 316, 322) and he was given pain medication (Tr. 322).

4. Mental health

A little over a month after the exposure to carbon monoxide, Dr. S.V. Advani noted that Jimmerson was under stress because of his recent problems (Tr. 198). Jimmerson took antidepressants prescribed by Dr. Richards in October and November of 2003, but discontinued them when things "got better" (Tr. 289).

In the course of his application for disability, Jimmerson was evaluated by Dr. Patricia Blake, a psychologist, on February 23, 2004 (Tr. 288-91). Dr. Blake observed that Jimmerson exhibited significant emotional distress one year after his carbon monoxide poisoning (Tr. 290). She listed her diagnostic impression as post traumatic stress disorder ("PTSD"), with a Global Assessment of Functioning ("GAF") of 60 (Tr. 290).[3] She stated that Jimmerson could benefit from antidepressant medication and therapy utilizing a PTSD paradigm (Tr. 290). Jimmerson subsequently saw Dr. Richard Nightingale, who rated his GAF as 60 or 65 (Tr. 313), and listed his diagnostic impression as adjustment disorder with mixed emotional features and PTSD (Tr. 310). Jimmerson followed up with Dr. Nightingale on two subsequent occasions, but they both agreed that he was handling things pretty well and no further appointments were scheduled (Tr. 308).

---

[3] A GAF of 51-60 indicates "moderate" symptoms or any "moderate" difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. text revision 2000).

Jimmerson received Prozac from Dr. Richard during 2005 and 2006 (Tr. 513-14).

5. The opinion of treating physician Dr. Richard

Dr. Richard treated Jimmerson consistently from the time of the exposure through July 14, 2006 (Tr. 243-49, 314-21, 451-52, 513-17).  He referred Jimmerson to specialists and received letters from those specialists updating him on Jimmerson's care (Tr. 198-99, 222-23, 505-08).  Dr. Richard reviewed the opinions of the toxicologist and neurologist (discussed below), and on October 9, 2006, stated his opinion regarding Jimmerson's ability to work:

> It is my considered opinion, based on the history Mr. Jimmerson gives me in reference to his ability to work combined with the professional opinion of experts in the field, that his level of dysfunction will likely be permanent. He has improved over the course of his illness, but has stabilized over the last several months.  Based on what I can discern from his function, he works considerably more slowly than he used to.  He has difficulty remaining on task and completing assigned tasks on time.  His fatigability usually limits his productive time, even at the diminished rate, to four hours or so per day.
>
> Based on what I am able to discern from the expert in Colorado, this is unlikely to change significantly for the positive after it has been stable this long.

(Tr. 518).

## B.  Consultative Examinations

1. Plaintiff's experts

### a. Dr. Helffenstein

Dr. Dennis Helffenstein, Ph.D., a neurologist and licensed clinical psychologist, performed a neuropsychological examination of Jimmerson from June 27, 2005 to June 29, 2005 (Tr. 346-68), after being retained in connection with Jimmerson's workers' compensation claim (Tr. 540).  Dr. Helffenstein then testified on behalf of Jimmerson in his workers' compensation case (Tr. 478-502).  Dr. Helffenstein testified that, at the time

of the deposition, he had done "well over 400" carbon monoxide evaluations and that he contributed a book chapter to a carbon monoxide toxicology textbook in 2000 (Tr. 487). Dr. Helffenstein testified that he spent twenty hours total with Jimmerson, interviewing his parents, doing testing, reviewing records, and preparing his report (Tr. 490).

Dr. Helffenstein noted Jimmerson's reported limitations in farming (Tr. 349). He noted Jimmerson's reported symptoms in detail, including muscle and joint pain, headaches, shortness of breath, gagging, dizziness, tingling in hands, fatigue, temperature regulation problems, high blood pressure, reduced tolerance for heat and humidity, sensitivity to fumes, vision problems, short-term memory problems, and mild depression (Tr. 350-53). He reviewed the medical records (Tr. 353-56). He noted his observations of Jimmerson's behavior (Tr. 356-57), and listed detailed results from the battery of tests he administered to Jimmerson (Tr. 357-60). He explained the neurological implications of the tests, connecting Jimmerson's reports of short-term memory loss and motor deficits to the carbon monoxide exposure (Tr. 361-63). In making these connections, Dr. Helffenstein explained the tests in great detail, and how they reveal Jimmerson's brain-based deficits. See, e.g., Tr. 361 (explaining how a particular degree of difference reflected in two of Jimmerson's scores occurs in only 6% of non-brain injured individuals); Tr. 362, 485 (explaining that Jimmerson's ability to retain newly learned visual information following a four-hour delay, not previously tested, was moderately to severely impaired, and "would suggest right temporal/ hippocampal involvement", after noting that "temporal and hippocampal function is highly susceptible to the effects of carbon monoxide poisoning"; later testifying at deposition that the type of short-term memory loss Jimmerson's test reveals is "very classic with the carbon monoxide poisoning"); Tr. 362, 486 (noting "several indicators of executive motor dysfunction on testing" and providing detail; later testifying to same).

Dr. Helffenstein noted that his neuropsychological tests are not designed to find all

10

potential deficits, including fatigue and physical problems like headaches and muscle pain, in a person exposed to carbon monoxide (Tr. 489).  He testified that "[o]rganically-based fatigue happens essentially a hundred percent of the time" in carbon monoxide patients (Tr. 489); he explained the physiological reasons for this and stated that Jimmerson has four to five hours of useful energy a day, absent heat and humidity (Tr. 489).  Dr. Helffenstein noted that Jimmerson's tests showed mild feelings of depression and anxiety (Tr. 363-64).

> Dr. Helffenstein summarized his findings as follows:
>
> Mr. Jimmerson continues to experience a constellation of physical, fatigue, visual, cognitive, and emotional coping deficits consistent with carbon monoxide poisoning.  (Tr. 365)
>
> Mr. Jimmerson was evaluated at 29 months post-exposure.  It is generally accepted in the field of brain injury rehabilitation that an individual will make his maximum cognitive recovery from this type of toxic poisoning in nine to twelve months.  Therefore, Mr. Jimmerson has clearly reached maximum medical improvement from a neuropsychological standpoint and the deficits noted on testing are considered to be permanent.

(Tr. 366).  Dr. Helffenstein, a Certified Rehabilitation Counselor (Tr. 367), also included his opinion concerning Jimmerson's ability to work:

> When one considers the combination of Mr. Jimmerson's physical, fatigue, visual, cognitive, and emotional deficits, it is my opinion, as both a neuropsychologist and vocational expert, that he is totally and permanently disabled from competitive employment.  It is my opinion, within reasonable neuropsychological and vocational certainty, that he would be unable to successfully maintain substantial gainful work activity.

(Tr. 367).

### b. Dr. Penney

Dr. David Penney, Ph.D, a toxicologist specializing in carbon monoxide poisoning, also evaluated Jimmerson and produced a report (Tr. 375-401), and subsequently testified

on Jimmerson's behalf in his workers' compensation case (Tr. 460-77).  Dr. Penney has spent thirty-five years in the area of carbon monoxide toxicology, has more research publications on carbon monoxide than anyone else in the world, and sees more people with carbon monoxide poisoning than anyone else in the world (Tr. 473).   He is not a vocational expert (Tr. 475).  Dr. Penney reviewed the medical records (Tr. 376-78), the neuropsychological evaluations (Tr. 378-79), spoke with Jimmerson by phone, visited Jimmerson's home in person in May 2005, spoke with Jimmerson's sons who live there (Tr. 379-81), administered questionnaires to Jimmerson and six others (Patti Jimmerson, Gary Jimmerson, Carol Jimmerson, Terry L. Motherhead, Alisha Summers, and Carol Robins) (Tr. 386-401), and made a trip to the facility where Jimmerson was exposed to carbon monoxide (Tr. 470).

Dr. Penney reported the following opinions:

That Galen Jimmerson was exposed to very high, even lethal concentrations of [carbon monoxide] at the swine facility for 45-50 minutes on January 20, 2003.

That the (immediate) symptoms experienced by Galen Jimmerson at the swine facility and immediately afterward, are wholey [sic] consistent with the known and documented immediate effects of acute [carbon monoxide] poisoning.

That the symptoms experienced by Galen Jimmerson since that time and to the present as seen in the medical record, in questionnaires and during interviews, are wholey [sic] consistent with the known and documented immediate effects of acute [carbon monoxide] poisoning.

That the residual health effects/ symptoms suffered by Galen Jimmerson are consistent with the known longterm effects of [carbon monoxide] poisoning.
…

That the liklihood [sic] of significant improvement beyond his present state is low, i.e. Mr. Jimmerson will continue to have impairment and dysfunction in many areas of his physical, intellectual, and mental health for many years to come.

That Galen Jimmerson's ability to obtain and maintain gainful employment has been totally eliminated by the physical, intellectual, and mental health problems he is left with.

(Tr. 383-84).

When asked at his deposition what objective evidence from the medical records indicated Jimmerson had carbon monoxide poisoning, Dr. Penney mentioned cherry red color, coughing up white sputum, hands trembling, tachycardia,[4] staggering gait, hyperglycemia,[5] elevated carboxyhemoglobin,[6] elevated creatine phosphokinase, and anxiety (Tr. 464).   He testified that the "sputum or frothy fluid" that Jimmerson was coughing up "was a product of pulmonary congestion, and that's one of the end stages of dying from carbon monoxide poisoning." (Tr. 466).   Dr. Penney also explained that he concluded that the initial reading of Jimmerson's carboxyhemoglobin was mistaken (Tr. 464).   Dr. Penney explained that the initial reading of 64.9% could not be correct, both because it would have been fatal, and because, when added to other percentage numbers that logically should have totaled 100, it far exceeded 100 (Tr. 464).   Dr. Penney, assuming the other percentage numbers were accurate, calculated Jimmerson's likely carboxyhemoglobin as measured at Decatur Hospital on the day of the exposure to be 25%, and probably as high as 35-40% when Jimmerson initially exited his work office (Tr. 470).   Dr. Penney also explained that Jimmerson's carboxyhemoglobin level of 5.1% the day after his exposure indicated that "this was a pretty darn severe [carbon monoxide] poisoning." (Tr. 470).

Dr. Penney also testified that CAT scans and MRI's, sometimes ordered by doctors after carbon monoxide poisoning, are very insensitive to the effects of carbon monoxide, such that nothing may be visible even though a person may have considerable damage from carbon monoxide (Tr. 468, see also Tr. 356 for Dr. Helffenstein's similar opinion).   He testified that neuropsychological testing is really the gold standard for measuring the

---

[4] Tachycardia is rapid heart beat.

[5] Hyperglycemia is an abnormally high level of glucose in the blood.

[6] Carboxyhemoglobin refers to the level of carbon monoxide in the blood.

13

presence of injury of the brain associated with carbon monoxide (Tr. 468), and characterized Dr. Helffenstein as the best neuropsychologist in the country in the area of carbon monoxide poisoning (Tr. 467).

Dr. Penney testified that short-term memory loss is extremely common following carbon monoxide exposure, affecting "probably 85 percent of people who have residual health effects of carbon monoxide" (Tr. 472). He also testified that headaches and whole body aches are very common in people with carbon monoxide poisoning (Tr. 473).

2. DDS physicians

On January 10, 2004, Dr. John May, M.D. completed a Physical Residual Functional Capacity Assessment of Jimmerson, noting very few limitations (Tr. 278-87). Dr. May stated in part:

> The claimant alleges chest and neck pain and states the pain is worse with movement. He also states he is short of breath and able to walk only short distances, but yet is noted to be able to supervise a farm operation, drive and socialize. Pain in his neck began in 8/03, and is made worse with lifting more than 10 pounds.
>
> This claimant has restrictive airway disease. He has not required recent hospitalization for treatment. Pulmonary function studies in 7/5/03 revealed findings not meeting listing level. It is also noted that he has been given a return to work order on 5/03 at the University of Iowa Hospitals. Although he suffered CO2 intoxication [sic], this is not felt to have caused a significant addition to his problem with reactive airway disease and this MDI is felt to be nonsevere...
>
> The claimant's allegations in reference to pulmonary status are not felt to be totally supported by the clinical findings and do at least partially erode the credibility of the claimant's allegations. The claimant states he can lift only ten pounds, but has no evidence of weakness of the upper extremities. He has not been limited significantly by treating sources and he is currently felt capable of the RFC as outlined.

(Tr. 286).

14

On February 20, 2004, Dr. Patricia Blake evaluated Jimmerson's mental health. While stating that Jimmerson could benefit from antidepressants and therapy (see above), she also stated:

> Mr. Jimmerson appears able to understand, remember, and carry out short and simple instructions.  He appears able to maintain adequate attention, concentration, and pace.  He appears able to interact appropriately with others in the workplace.  He appears able to use good judgment.

(Tr. 290).

On March 3, 2004, Dr. Sandra L. Davis, Ph.D, filled out a Psychiatric Review Technique form, indicating that Jimmerson suffered no more than a mild degree of limitation stemming from mental problems in daily living, social functioning, and concentration (Tr. 302).  She stated in part:

> In summary, the claimant has had some emotional repercussions since his accident, with some PTSD symptoms persisting.  Nonetheless, his work activity has been largely impacted by his physical condition and not by emotional symptoms.  Memory has not been assessed as significantly impaired.  In fact, the CE psychologist identifies no significant restrictions.  As such, this condition would be considered nonsevere.
>
> The medical evidence is generally consistent.  The claimant's allegations are credible to the extent his accident influenced his emotional well-being, but on a psychological basis, his condition would be nonsevere by Social Security standards.

(Tr. 306).

On July 27, 2004, Dr. Lon Olsen, Ph.D., filled out a Psychiatric Review Technique form for Jimmerson (Tr. 331-344).  Finding no more than mild limitation, Dr. Olsen stated:

> The claimant lives with his wife and her children.  He is independent for all self-cares, but needs reminders to take medications.  He does a few household chores, but was never involved in most such tasks.  He attends medical appointments independently.  He has a driver's license and drives

every day.  He understands and remembers television programs and farm machinery advertising.  He participates in family dinners and gatherings.  He does not have trouble getting along with others.  He has recently been coaching girls' basketball at the local junior high school.  He is more easily angered by criticism than he used to be, but reports a history of very good work relationships.   He misplaces items more easily than before and responds poorly to stressors.   He pays bills and manages money independently.  He farms his own 160 acres and another 90 acres and helps out at his father's farm.

The claimant does have an MDI, but it is not severe and would not prevent him from performing work-like activities.  Overall, he attributes his limitations to his physical condition, not his mental condition.  He is independent for all self-cares, performs a variety of daily activities, maintains at least superficial social relationships, and engages in purposeful activity when he is motivated to do so.

(Tr. 343).

At reconsideration, on August 11, 2004, Dr. M.M. Greenfield, M.D. filled out a Physical Residual Functional Capacity Assessment of Jimmerson, noting very few limitations (Tr. 325-30).  Dr. Greenfield stated:

This is a reconsideration DIB claim with an AOD of 1-20-03.  Claimant is a 35 year old male who alleges disability on the basis of carbon monoxide poisoning, back problems, memory loss, chest pain, visual problems, and breathing.  Claimant has a long history of asthma though it had not required significant care.   In 1-03, claimant had episodes of carbon monoxide intoxication that was treated with hyperbaric O2 but he continued to complain of SOB with exertion.  Evaluation at the UIHC included pulmonary function studies that revealed FEV1 of 3.6 and FVC of 4.52.  Improvement of FEV1 was noted with bronchodilators.  He was diagnosed with asthma and was given a return to work order in 5-03.  A 12-03 UIHC evaluation revealed FEV1 3.29 and FVC 4.73 and following inhaled bronchodilator FEV1 was 3.59 and FVC was 4.88.  Claimant reported that his symptoms increased with exposure to cold air and with strenuous activity.  Tilade was prescribed to be used prior to exercise.  When employment was discussed, claimant stated that he didn't think he could return to his former job due to exposure in the hog confinement buildings increasing asthma symptoms.

16

Use of a respirator was not accepted by claimant due to the restriction in field of vision it would impose causing an occupational hazard. Claimant has also reported that he was working part time coaching a girl's basketball team in junior high as well as farming 160 acres of his own land plus another 90 acres. He has stated that symptoms increase when he grinds feed. Claimant has had a normal cardiac evaluation in the past as well as normal chest x-rays. Claimant reported onset of neck pain in 8-03 and an MRI revealed suspicion of C5-6 disc without encroachment noted. An EMG revealed no evidence of radiculopathy. Discography was performed and was positive at C5-6. More current notes in file refer to cervical fusion in 1-04. These notes were not pursued with regard to his recovery since other notes in 6-04 indicate that claimant sought care for intermittent back pain along with some hematuria. Urological evaluation was negative and it was thought to be musculoskeletal due to his sitting on a tractor and baling hay daily. Celebrex was prescribed. MRI of the brain was negative. Ophthalmological evaluations have indicated that claimant's visual acuity corrects to 20/20 and while some subtle changes could not be ruled out due to the CO exposure, he didn't have any identifiable treatable ocular pathology. Claimant reports to DDS that he sits in a recliner and watches TV all day since he can't breathe outside and that he has constant back pain. These reported limitations are far in excess of those reported to medical providers to whom he reports increased SOB with cold air and strenuous activity. He has reporting [sic] baling hay and farming 250 acres. The inconsistency seriously erodes the credibility of the allegations. The only MSS in file is the return to work in 5-03. Claimant does have asthma and cervical DDD presumably s/p fusion that could reasonably result in some functional limitation. The RFC provided is consistent with ADLs reported to the medical providers.

(Tr. 325-26).

## C.  Hearing Testimony

The ALJ held Jimmerson's hearing on February 20, 2007. At the time of the hearing, Jimmerson was thirty-eight years old. His wife, Patti Jimmerson, also testified. Vocational expert Jeff Johnson ("the VE") also testified.

Jimmerson testified as follows. His last job was at Iowa Select Farms, where he was co-managing a guild developer (Tr. 543-44). When he worked there, he would work

from 7:00 am until 1:00 pm, doing any breeding that needed to be done, sorting pigs, and bookwork (Tr. 549). At 1:00 pm, he would go home and do his hay and help his father with his hay, working in the summer until 10:00 or 11:00 pm (Tr. 550). He would sometimes carry calves that weighed up to 100 pounds (Tr. 550-51), and threw around 70-75 pound square bales of hay all day (Tr. 551-52). He also used to break horses and ride bulls (Tr. 552). He also played organized basketball until his exposure (Tr. 562).

At Iowa Select Farms, Jimmerson was exposed to carbon monoxide (Tr. 544). He was in the office doing paperwork, and he had sent the other co-manager out to power wash the hallways and loading chute (Tr. 544). The office consisted of two small rooms with a shower between them, and the power washer and heat exchange were in the room Jimmerson was not in (Tr. 544). The co-manager turned on the power washer and did not open the propane-powered heat exchange chimney (Tr. 544). After about forty-five minutes (Tr. 545), Jimmerson became dizzy and lightheaded; when he stood up, he fell down and couldn't walk (Tr. 545). His balance was off. He told himself he had to get out (Tr. 545). He did not remember walking from the desk to the shower, but he remembered stumbling through the shower (Tr. 545). He exited the building, and stood for five or ten minutes outside trying to get air (Tr. 545). He felt like his lungs were on fire, felt a massive headache, and felt confused and disoriented (Tr. 545). He went back in and opened the chimney, and sat down feeling sick and having trouble thinking (Tr. 545). He relayed what happened to his co-manager, who, declining to help, walked outside for a cigarette (Tr. 545-46). Jimmerson began to gag and tried to throw up, but could not (Tr. 546). He produced a white brownish foam, and his lungs and throat were hurting terribly (Tr. 546). He drove himself seventeen miles back to his home to get help (Tr. 546).[7]

---

[7] When asked why he drove seventeen miles rather than contact an ambulance, he reported that the location he worked at is quite remote, and an ambulance would have difficulty finding him, and he was not in a position to give accurate directions (Tr. 192). He reported that he was unable to drive in a straight line and was weaving back and forth and making

After treatment, Jimmerson did not go back to work because his balance was off, he was having headaches all the time, and he was having trouble breathing (Tr. 546). The main thing that keeps him from working is his lungs; he only has 65% of his capacity (Tr. 549). He had asthma before his exposure, but never needed medication (Tr. 554).

Jimmerson is tired all the time (Tr. 554). He has difficulty breathing in a hot and humid environment (Tr. 555-56). If he goes outside, he gets in the air-conditioned truck or tractor (Tr. 549, 556). He is never in the tractor more than four hours, because he gets tired (Tr. 556). He does not do four hours of work every day because it depends on the weather and how tired he is (Tr. 556). Otherwise, he remains in the house (Tr. 556, 562). He takes Tylenol every day for headaches (Tr. 556). He has trouble with balance, though he used to have very good balance (Tr. 556-57). He throws up at least once or twice a day (Tr. 557). He cannot work on his back, reaching up (Tr. 557). He has trouble with temperature regulation, as he is hot all the time (Tr. 558). Smoke, exhaust fumes, some kinds of perfume, and strong solvents bother him (Tr. 558). He lost quite a bit of eyesight in his left eye in the exposure (Tr. 559). His peripheral vision in both eyes is impaired (Tr. 559). He has problems with concentration and memory (Tr. 559-60, 563-64). He has high blood pressure, which he did not have before the exposure (Tr. 560).

For his shortness of breath, Jimmerson uses an inhaler (Tr. 560). For his vomiting, he takes Nexium (Tr. 560). He also takes high blood pressure pills and an antidepressant (Tr. 560).

He has a farm of one hundred sixty acres with eighty cattle (Tr. 542). Eighty acres are in a Conservation Reserve Program,[8] but will return to pasture and hay (Tr. 543). His

---

extremely wide turns, and that a friend who had observed him later informed him of his erratic driving (Tr. 347).

[8] The program encourages farmers to convert highly erodible cropland or other environmentally sensitive acreage to vegetative cover, such as tame or native grasses; farmers receive an annual rental payment for the term of a multi-year contract.

cows are with his mother's cows, and his mother's hired man, Sean, takes care of them (Tr. 547-48). Jimmerson takes care of his daughter's four show calves for a half hour in the morning and a half hour at night, leading them to water and hand-feeding them with a three-pound feed scoop (Tr. 548, 555). He also drives Sean around to check the cows (Tr. 548-49). Had he not been exposed to carbon monoxide, he would be doing all of the work that Sean does; he would be taking care of both hog billings and doing all the cattle work himself (Tr. 555). Before, he could feed his cows by himself, chop ice, roll bales of hay down the hill, and work outside (Tr. 562). Now, he makes his own schedule, and some days he does not leave the house (Tr. 562). He works at his own pace and takes breaks when and for as long as he wants to (Tr. 562). He only helps with the baling from the inside of the air-conditioned tractor, which he does sometimes on his mother's 500 acres (Tr. 563).

He coaches junior high girls basketball during November, December, and January for $1,554 (Tr. 542, 561). They have practice three times a week for an hour and a half, and two games a week, which last an hour (Tr. 561).

Jimmerson's wife, Patti Jimmerson, testified as follows. She takes care of the farm's records, because Jimmerson cannot sit down and stay focused (Tr. 565). He has forgotten things like turning off the water to the livestock tank, resulting in a pond outside and wasting a lot of water (Tr. 565-66). He forgets to bring his medication with him (Tr. 567). He cannot chop wood anymore (Tr. 567). He has no use of his hands when they are above his head (Tr. 568). He is tired all the time (Tr. 568).

The VE also testified in response to several hypothetical questions. The ALJ asked four hypothetical questions. The first was as follows:

> The first would limit lifting to 50 pounds occasionally and 25 pounds frequently; stand and sit six hours each in an eight hour workday; non-exertional physical limits would all be frequent and constant, except only occasional ladder climbing and occasional crawling; provide for only occasional exposure to extremes of heat, cold, humidity, wetness, dust, and

fumes; and finally, frequent peripheral vision bilaterally.  If bilateral is the
right term for the eyes, left and right.  With this residual functional capacity,
could any of the past relevant work be performed?

(Tr. 570).  After clarification of the environment of one of Jimmerson's previous jobs, the
VE answered that all past relevant work was precluded.  But the VE answered that there
would be jobs of an unskilled nature that such person could perform, including cashier,
cafeteria attendant, dining room attendant, and hand packager (Tr. 570-71).

The ALJ asked a second hypothetical:

The second hypothetical I'm going to go down to 20 pounds occasionally and
10 frequently.  We're now going to provide for more than simple routine
work, but not complex.  In other words, semi-skilled work.  With that
residual functional capacity, are there jobs that could be performed by that
hypothetical individual?

(Tr. 571).  The VE answered yes, that the same jobs could be performed, in addition to
office helper (Tr. 572).

The ALJ asked a third hypothetical:

The third hypothetical would go to 10 pounds occasionally and five pounds
frequently.  Stand two hours in an eight-hour workday, sit for six, the rest
remaining the same.  With that addition, are there any jobs that could be
performed by the hypothetical individual?

(Tr. 572).  The VE again answered that some of the same positions could be performed,
but the number of jobs would be reduced by 50% (Tr. 572).

The ALJ asked a fourth hypothetical:

The fourth hypothetical would be the same as number 3, except I would add
two 30-minute unscheduled rest breaks per day.  With that addition, may
work be performed by the hypothetical individual?

(Tr. 573).  The VE answered that unscheduled work breaks would preclude employment
in the positions previously discussed (Tr. 573), and could preclude all employment (Tr.
574).

21

Jimmerson's attorney asked a number of questions.  The VE testified that if a person could only tolerate four hours of work per day, all competitive employment would be precluded (Tr. 575).  The VE also testified that if the person had to work at a slow pace one-third of the workday, all competitive employment would be precluded (Tr. 575).

## III.  CONCLUSIONS OF LAW

### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole.  See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (internal quotation marks and citations omitted).  The court must take into account evidence that fairly detracts from the ALJ's findings, as well as evidence that supports it. Id. (citing Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  "[T]he possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence."  Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003) (internal quotation marks and citations omitted). "[E]ven if inconsistent conclusions may be drawn from the evidence, the decision will be affirmed where the evidence as a whole supports either outcome."  Id. (citations omitted). "[A] reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Wilcutts v. Apfel, 143 F.3d 1134, 1136-37 (8th Cir. 1998) (citation omitted).

### B.  ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation.  See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The five steps are:

(1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)    If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)    If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f)).  "The claimant bears the burden of demonstrating an inability to return to her past relevant work."  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (citation omitted).  "If the ALJ determines the claimant cannot resume her prior occupation, the burden shifts to the Commissioner at step five to show the claimant is capable of performing other work."  Id. (citation omitted).

At the first step, the ALJ found that although Jimmerson worked after his alleged onset date, doing farm work and coaching, he has not engaged in substantial gainful activity (Tr. 21).  At the second step, the ALJ determined that Jimmerson had the following severe impairments: asthma, cervical degenerative disc disease, status post carbon monoxide poisoning, status post cervical fusion, and cognitive disorder NOS (not

23

otherwise specified) due to carbon monoxide poisoning (Tr. 21).  The ALJ also found that Jimmerson's non-severe impairments include adjustment disorder, post-traumatic stress disorder history, and headaches (Tr. 21).   At the third step, the ALJ determined that Jimmerson does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments (Tr. 21-22).

Before considering step four of the evaluation process above – whether the claimant can perform past relevant work – the ALJ must first determine the claimant's Residual Functional Capacity (20 CFR 404.1520(e) and 416.920(e)).   An individual's Residual Functional Capacity ("RFC") is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Before the fourth step, the ALJ determined Jimmerson's RFC.  The ALJ found that, while Jimmerson's medically determinable impairments could reasonably be expected to produce his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 23).  The ALJ similarly found Jimmerson's wife's testimony not entirely credible because it supported Jimmerson's allegation that he was totally disabled (Tr. 23).  In making these findings, the ALJ wrote that he found Jimmerson's reports of physical activity – including baling hay on a daily basis and going turkey hunting – to be inconsistent with his allegations that he could not walk more than twenty feet or lift more than ten pounds (Tr. 23).  The ALJ reviewed the opinions of the DDS physicians and psychologists, noting their questioning of Jimmerson's credibility based on perceived inconsistencies between the medical records and Jimmerson's complaints (Tr. 23-25).  The ALJ also reviewed the medical records and found that Jimmerson's lung problems and vision problems are not supported by the objective medical evidence (Tr. 25-26).  The ALJ found that Jimmerson's reports of

24

physical activity contradicted his allegations of physical disability, and stated that the reports of Drs. Helffenstein and Penney did not disprove Jimmerson's ability to perform simple and routine tasks (Tr. 25).  The ALJ  found Jimmerson to retain the following RFC:

> The claimant has the residual functional capacity to perform the exertional and nonexertional work-related activities except that he can lift and carry no more than twenty pounds occasionally and no more than ten pounds frequently.  He can sit and stand six hours each during an eight-hour workday; and he can frequently climb stairs, balance, stoop, kneel and crouch.  He can occasionally climb ladders and crawl, and he can occasionally be exposed to extremes of heat and cold temperatures, humidity, wetness, dust, and fumes.  He can perform more than simple routine work, but not complex tasks.  He can frequently use his peripheral vision bilaterally.

(Tr. 22).

Based on this RFC assessment and the testimony of the VE, at the fourth step the ALJ found that Jimmerson is unable to perform any past relevant work as a hog confinement manager, farm worker, or wire preparation worker (Tr. 25-26).  However, at the fifth step, the ALJ found that, given his RFC, Jimmerson could perform work activity as a cashier, cafeteria attendant, or an office helper (Tr. 26).  Thus, the ALJ found, Jimmerson is not disabled (Tr. 27).

Jimmerson argues that the ALJ erred in the following three ways:

(i) The ALJ erred in his assessment at step two by failing to recognize that Jimmerson's post traumatic stress disorder, adjustment disorder, mood disorder, and headaches are severe impairments;

(ii) The ALJ failed to evaluate the credibility of Jimmerson's testimony and the testimony of his wife according to the prevailing legal principles; and

(iii) The ALJ erred in his assessment of Jimmerson's RFC by failing to include all limitations documented by the medical evidence.

25

### C. ALJ's omission of Jimmerson's post traumatic stress disorder, adjustment disorder, mood disorder, and headaches from list of severe impairments

At step two of the sequential analysis, the ALJ recognized several of Jimmerson's impairments as severe (Tr. 21). But he found Jimmerson's adjustment disorder, post-traumatic stress disorder history, and headaches to be non-severe (Tr. 21). The ALJ did not mention whether Jimmerson's mood disorder is severe or non-severe (Tr. 21). Jimmerson argues that his adjustment disorder, post-traumatic stress disorder, headaches, and mood disorder were severe, and therefore the ALJ's finding was in error. Because of this error, Jimmerson argues, the ALJ failed to include all relevant impairments in his hypothetical questions to the VE, and thus the ultimate RFC is incomplete.

An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. 404.1520(c). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citing Bowen, 482 U.S. at 153 and 20 C.F.R. 404.1521(a)). The ALJ explicitly referred to this standard (Tr. 20). The ALJ, then, in finding certain conditions not severe, found they do not significantly limit Jimmerson's ability to perform basic work activities (Tr. 21).[9]

This finding is clearly supported by substantial evidence in the record. Jimmerson himself says that it is his lungs that keep him from working (Tr. 549). Jimmerson's counsel writes that Jimmerson himself would be the first to admit that the success of his claim turns on the extent of his physical dysfunction, not any alleged mental dysfunction

---

[9] The fact that the ALJ did not mention the mood disorder does not compel reversal. First, mood disorder appears only one place in the record, in a report by a non-treating source (Tr. 367). Moreover, it does not appear to be severe. See below.

(Dkt. 9, at 39-40).[10]   In addition, the medical records Jimmerson cites – those of Dr. Blake, Dr. Nightingale, and Dr. Helffenstein – clearly reflect no more than mild mental impairment from post traumatic stress disorder, adjustment disorder, and mood disorder. Dr. Blake referred Jimmerson to Dr. Nightingale, to whom, at his third appointment, Jimmerson denied PTSD symptoms and reported that his mood had been okay and he had not been feeling depressed or anxious (Tr. 307).   At that appointment, Dr. Nightingale listed Jimmerson as having a "past history of post-traumatic stress disorder" (Tr. 307). No further appointments were scheduled because Jimmerson felt, and Dr. Nightingale concurred, that Jimmerson was "handling things pretty well" (Tr. 308).   Dr. Helffenstein's report shows only mild depression (Tr. 352, 366).   Both DDS physicians who evaluated Jimmerson's mental health felt that Jimmerson's mental limitations were not severe (Tr. 302, 343).

Jimmerson's argument that the very fact that these conditions were diagnosed resolves the issue of whether each disorder is severe is incorrect.   While the medical definition includes clinically significant distress or impairment in some area of functioning, nothing in the medical definition requires a significant limitation on an individual's ability to perform basic work activities.   Jimmerson's citation to Nicola v. Astrue, 480 F.3d 885 (8th Cir. 2007) is unavailing.   There, unlike here, the court – and, indeed, the Commissioner – agreed with the claimant that the ALJ erred in failing to find the condition to be a severe impairment.   Here, the court disagrees with the claimant, and finds that substantial evidence supports the ALJ's finding that these conditions were not severe.

It is clear that Jimmerson reported headaches (Tr. 136-37, 188, 192-93, 222, 248-49, 252, 257, 271, 289, 311, 316, 379, 503).   However, the record does not show that his headaches significantly limited his ability to perform basic work activities.   While

---

[10] Counsel clarifies that Jimmerson's cognitive disorder – which the ALJ found to be severe – is part of his physical dysfunction for purposes of this statement.

Jimmerson emphasizes that "severity" is a de minimis standard that is easily met, "it is also not a toothless standard". <u>Kirby</u>, 500 F.3d at 708 (citations omitted). Substantial evidence supports the ALJ's finding that Jimmerson's headaches were not severe.

The ALJ did not err at step two of the sequential analysis.

## D. ALJ's Determination of Jimmerson's RFC

1. Credibility determination

Jimmerson argues that the ALJ erred in assessing his credibility, and thus erred in determining his RFC. When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." <u>Finch</u>, 547 F.3d at 935 (citation omitted). In evaluating a claimant's credibility, the ALJ must look to the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Id.</u> at 1321-22; SSR 96-7p.[11] The ALJ should also consider any measures other than treatment the claimant uses to relieve pain or other symptoms, and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Where an ALJ seriously considers but for good reasons explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility determination. <u>Johnson</u>, 240 F.3d at 1148. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotation marks and citations omitted). The court

---

[11] Available at Social Security Administration website,
http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html (July 2, 1996).

will "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (citation omitted).

Here, the ALJ's determinations regarding Jimmerson's credibility were unsupported by good reasons and substantial evidence. The ALJ wrote that he discounted Jimmerson's reported complaints because they were not supported by the objective evidence and that there were inconsistencies between Jimmerson's reported symptoms and his daily activities. However, the ALJ selectively reviewed the objective evidence, and the purported inconsistencies do not exist because they rest on a misunderstanding of Jimmerson's alleged basis for disability.

The ALJ explained how Jimmerson's reported symptoms were not supported by the objective evidence. In particular, the ALJ cited Dr. Hartley's examination of Jimmerson that showed only mild impairment of the lungs (Tr. 25, citing Tr. 505), and Jimmerson's spirometry exam in July of 2003 showing normal lung capacity (Tr. 25, citing Tr. 229). The ALJ also cited the opthalmalogist's report that Jimmerson had a normal eye exam (Tr. 25, citing Tr. 503-04). The ALJ cited the interpretations of the medical records by the DDS physicians, and agreed with their findings. See Tr. 23-24 (citing Dr. May's consultative examination) and Tr. 25 (citing Dr. Greenfield's consultative examination). Wholly absent from the ALJ's review of the objective medical evidence is any mention of the treating source opinion of Dr. Richard. See Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001) (opinion of consulting physician who examines claimant once is not substantial evidence on which to base a denial of disability, especially if the consultant's opinion is contradicted by that of the treating physician).

The ALJ also failed to consider the bulk of evidence from the reports of Drs. Penney and Helffenstein, the carbon monoxide specialist and the neurologist respectively. The ALJ provides no reason to discount the findings of Drs. Penney and Helffenstein,

asserting only that their reports do not disprove Jimmerson's ability to perform simple and routine tasks (Tr. 25), and that any assessment of whether Jimmerson can work is properly left to the Commissioner (Tr. 24).

The problem is that this does not address the basis upon which Jimmerson alleges disability. He does not allege disability on the basis that he cannot perform simple and routine tasks. It is clear that he can – he testified that he feeds his daughter's show calves, coaches basketball, and drives a truck and tractor. Instead, Jimmerson says he cannot do simple and routine tasks more than four hours a day, without breaks, because of his organically-based fatigue and limited energy stemming from brain changes after his exposure to carbon monoxide. The ALJ provided no reason to discount the objective medical evidence from Drs. Penney and Helffenstein that Jimmerson suffers this fatigue.

Moreover, though the ALJ asserts that the objective medical evidence does not fully support Jimmerson's subjective complaints, Polaski itself prohibits the ALJ from disregarding Jimmerson's subjective complaints on this basis alone. Polaski, 739 F.2d at 1322. But the ALJ does not rest his credibility finding on objective medical evidence alone. He details several inconsistencies he perceives between Jimmerson's reported limitations and his reported daily activities. On closer examination of the record, and with a clear understanding of Jimmerson's alleged basis for disability, these inconsistencies simply do not exist.

The ALJ first finds that Jimmerson's reports of baling hay on a daily basis and going turkey hunting are inconsistent with his allegations of physical disability "such as his statement on September 18, 2003 [in his personal pain questionnaire], that he could not walk more than 20 feet or lift more than ten pounds" (Tr. 23, citing 116-119). However, the ALJ does not note that this questionnaire was filled out during a time period when Jimmerson was receiving ongoing treatment for a well-documented, severe neck condition for which he underwent surgery a few months later (see Tr. 231, 238-42, 255-67). During

this time, Jimmerson specifically reported to his orthopaedic surgeon that he "finds it difficult to lift anything heavy" (Tr. 257) and that the pain had adversely impacted his daily activities (Tr. 255). He also stated on a function report from the same time that he did not do house or yard work because he was "weight restricted due to neck problems" (Tr. 107). The ALJ also fails to note that Jimmerson did not say he could not walk more than 20 feet, but that after walking that far he begins to have problems (Tr. 119), which is consistent with his reports at other places in the record (Tr. 109, 121, 222), and reports of others (Tr. 379). It is also not inconsistent with his reported daily activities, which do not involve great amounts of walking. Jimmerson's single report of turkey hunting is also not inconsistent with his reported limitations; he and others specifically report good days and bad days (Tr. 379, 381, 562).

The ALJ also emphasizes Jimmerson's frequent activities of farming, baling hay, and coaching basketball as much as a couple hours per day as inconsistent with his reported symptoms and alleged disability. But there is no inconsistency here. Jimmerson has consistently reported symptoms of shortness of breath with exertion (Tr. 107, 111, 117, 188, 198, 225-26, 238, 248, 267, 269, 275, 351), and consistently stated that in farming and baling hay he is limited to driving only about four hours in the cab of his air-conditioned tractor (Tr. 226, 289, 349, 549, 555-56, 563). Nothing in the record indicates that he is farming and baling hay full time or by himself without major assistance. His alleged disability, as noted above, is not based on any allegation that he cannot do anything on the farm or coach basketball. It is rather based on his allegation that the brain-based fatigue he suffers from his carbon monoxide exposure, and lower lung capacity – which the medical records show is at or below the low level of normal (Tr. 505) – render him unable to work for more than four or five hours a day. The fatigue also requires him to take unscheduled breaks, when he wants, for as long as he wants (Tr. 562), and he cannot work several days in a row, even at four hours a day (Tr. 349, 380). Given this specific

basis for his alleged disability, there is no inconsistency between Jimmerson's daily activities and his reported symptoms and alleged disability.  Accord Harris v. Secretary of the Dep't of Health and Human Servs., 959 F.2d 723, 726 (8th Cir. 1992) (claimant's ability to cook, shop, clean, do laundry and visit friends does not constitute substantial evidence that claimant can engage in substantial gainful activity).  "[A] claimant need not prove that he or she is bedridden or completely helpless to be found disabled." Payton v. Shalala, 25 F.3d 684, 687 n.6 (8th Cir. 1994).

Moreover, this record is devoid of any suggestion of inconsistency – apart from the ALJ's opinion and the notes of the DDS physicians.  To the contrary, the consistency of Jimmerson's alleged symptoms is striking.  His statements regarding each symptom, made to several different doctors, on questionnaires, and at his hearing, are remarkably consistent with one another.  See, e.g., Tr. 98, 107, 111, 117, 120, 125, 188, 193, 222, 225-26, 238, 248, 257, 267, 270, 275, 289, 311-12, 351, 505, 509, 546, 554 (alleging shortness of breath and fatigue); Tr. 98, 109, 182-84, 188, 222, 240, 249, 271, 311, 351, 451, 546, 556 (alleging dizziness and balance problems); Tr. 98, 109, 226, 240, 312, 350 (alleging muscle and joint pain); Tr. 98, 109, 183, 187, 222, 240, 269-71, 313, 351-52, 380, 451, 503, 559 (alleging vision problems); Tr. 98, 116, 120, 138-39, 193, 198, 226, 269, 380  (alleging lung and chest pain); Tr. 98, 106, 108-09, 115, 133, 135, 188, 289, 312, 352, 379, 559-60, 563-64 (alleging problems with short-term memory); Tr. 125, 155, 183, 188, 193, 240, 249, 257, 271, 289, 311-12, 316, 322, 351, 379, 451-52, 503, 546, 556 (alleging headaches); Tr. 109, 226, 275, 351, 380, 558 (alleging sensitivity to smoke and fumes); Tr. 120, 226, 307, 349, 351, 379, 380, 549, 555-56, 563 (alleging that heat and humidity exacerbates shortness of breath); Tr. 110, 121, 193, 198, 222, 238, 266, 275, 313, 352-53 (reporting when medication helps, regarding shortness of breath, neck pain, and depression); Tr. 198, 226, 266, 381 (alleging perspiration on only one side of body).

Jimmerson's reported symptoms are also remarkably consistent with the reports of others.  See Tr. 400 (consistent reports of headache, muscle pain, shortness of breath, chest pain, tiredness/ fatigue, and weakness, by five people other than Jimmerson); 386 (consistent reports of symptoms, and their intensity, by Jimmerson and three others, concerning headaches, muscle pain, shortness of breath, tiredness/ fatigue, and weakness); 388 (same, for vision problems and physical strength problems); 565-68 (wife saying Jimmerson is tired all the time, cannot chop wood anymore, and has short-term memory problems); 364-65 (parents reporting severe problems with fatigue and sensitivity to fumes, mild problems with dizziness and balance, mild vision problems, and mild short-term memory problems); 379 (son saying heat aggravates Jimmerson's symptoms and he cannot do nearly as much work as he used to); 380 (other son saying Jimmerson gags and vomits in heat and humidity, and has memory problems).

Furthermore, Jimmerson's symptoms are remarkably consistent with what the carbon monoxide expert and neurologist say are the common effects of carbon monoxide exposure.  See Tr. 355 (Jimmerson's reported symptoms are totally consistent with carbon monoxide exposure); Tr. 383 (headaches, fatigue, tiredness, dizziness, balance problems, shortness of breath, chest pain, muscle and joint pain, and short-term memory problems all can result from carbon monoxide exposure); see also Tr. 361, 363 (vision problems often result from carbon monoxide exposure), 471-473 (sensitivity to fumes is common with carbon monoxide exposure), 486, 489 (fatigue common with carbon monoxide exposure).  Finally, from the many doctors that treated Jimmerson, there is nothing in the record questioning Jimmerson's credibility or stating he was making up symptoms or noncompliant with treatment recommendations.   To the contrary, several doctors specifically noted that he appeared to be compliant and cooperative (Tr. 253, 259, 288, 356), and a good historian (Tr. 194, 226, 255, 257).

In light of this record, and Jimmerson's solid work history before his exposure to

carbon monoxide, see Nunn v. Heckler, 732 F.2d 645, 648 (8th Cir. 1984) ("a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability"), the perceived inconsistencies identified by the ALJ do not provide a basis to discount Jimmerson's subjective complaints.    There are not inconsistencies in the record as a whole, and the ALJ's credibility finding was error.

2. The impact of credibility on Jimmerson's RFC

"[A] claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. § 404.1545 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Jimmerson argues that the ALJ erred in assessing his RFC by failing to include all limitations documented by the medical evidence.  "In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole." Finch, 547 F.3d at 937.  Indeed, "[v]ocational testimony elicited by hypothetical questions that fail to relate with precision the physical and mental impairments of the claimant cannot constitute substantial evidence to support the Secretary's decision." Ness v. Sullivan, 904 F.2d 432, 436 (8th Cir. 1990) (citation omitted).

Jimmerson argues that the first three RFC hypotheticals posed to the VE failed to include all his impairments supported by substantial evidence, including Jimmerson's impairments caused by his fatigue and shortness of breath.  The court agrees.  The ALJ's first three hypothetical questions to the VE on which he rested his finding of non-disability

34

did not include the requirements that Jimmerson be able to take breaks whenever he wants for however long he wants, that he be limited to four to five hours of work per day, or that he work at a slow pace for one-third of the workday.  These impairments are supported by substantial evidence in the record, given Jimmerson's and others' consistent reports of fatigue and shortness of breath, and the opinions of Drs. Richard, Helffenstein, and Penney.  Because the first three questions the ALJ asked did "not include all of the claimant's impairments, limitations, and restrictions, or [were] otherwise inadequate, [the] vocational expert's response[s] cannot constitute substantial evidence to support a conclusion of no disability."  Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998).

The vocational expert, when posed hypothetical questions properly crediting the medical evidence and Jimmerson's subjective complaints, testified that Jimmerson was precluded from engaging in full-time competitive employment.  The ALJ's decision to the contrary is not supported by substantial evidence in the record as a whole and must be reversed.

## IV. CONCLUSION

Upon the foregoing,

**IT IS ORDERED** that the decision of the ALJ is hereby reversed and remanded for an award of benefits.  The Clerk of Court shall enter judgment accordingly.

**DATED** this 13th day of May, 2010.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA

35